J-S12014-25
J-S12015-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| IN RE: W.M.M.H., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: R.M., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2976 EDA 2024 |

Appeal from the Decree Entered September 24, 2024
In the Court of Common Pleas of Montgomery County
Orphans' Court at No: 2023-A0175

| IN RE: W.M.M.H., A MINOR | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| APPEAL OF: L.D.H., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 2826 EDA 2024 |

Appeal from the Decree Entered September 24, 2024
In the Court of Common Pleas of Montgomery County
Orphans' Court at No: 2023-A0175

BEFORE: STABILE, J., McLAUGHLIN, J., and BENDER, P.J.E.

MEMORANDUM BY STABILE, J.: **FILED JUNE 23, 2025**

R.M. ("Father") and L.D.H. ("Mother") (collectively, "Parents") appeal

from the September 24, 2024, decrees involuntarily terminating their parental

rights to their daughter, W.M.M.H. ("Child"), born in June of 2022.[1]  Upon careful review, we affirm.

**FACTUAL AND PROCEDURAL HISTORY**

The record reveals the following factual and procedural history.  Child was placed in the emergency custody of the Montgomery County Office of Children and Youth ("the Agency") upon discharge from the hospital after birth due to Parents exhibiting symptoms of mental illness and being homeless. N.T., 6/6/24, at 103-108.  Following hearings, the court placed Child in shelter care on June 13, 2022, and adjudicated her dependent on June 22, 2022.

The court established Child's permanency goal as reunification.  In furtherance of that goal, the Agency created a family service plan for Parents which required them to address their mental health, including acknowledging their diagnoses and need for treatment; taking psychotropic medication as prescribed; and learning how their mental health can affect the care and safety of Child.  *Id.* at 106-107.  Further, the family service plan required Parents to obtain suitable housing; to engage appropriately with Child during supervised visitation; and to cease all domestic violence activity.  *Id.* at 119, 134, 149.

The court held permanency review hearings approximately every three months beginning in July of 2022, with the most recent one prior to the involuntary termination proceeding occurring in February of 2024.  *Id.* at 133.

_____

[1] We review Parents' separate appeals in this memorandum because they raise similar issues and involve the same factual and procedural history.

- 2 -

At each of those hearings, the court found that Parents had made minimal progress in satisfying their permanency objectives. *Id.* at 133-134.

Most importantly, according to the Agency caseworker, Loretta Smith, Father was diagnosed with "schizophrenia and Asperger's syndrome," and he did not attend outpatient mental health treatment during Child's dependency case. *Id.* at 135-137. The Agency referred Parents to Jessica Port, Psy.D., a licensed psychologist, for comprehensive psychological evaluations and parenting assessments, which she completed in July of 2023. During the subject proceeding, Dr. Port opined that Father's mental health condition would negatively affect his ability to understand Child's "needs and wants. . . . He may not understand at times that the child is upset or sad and what that might mean."[2] *Id.* at 29-30. Dr. Port opined that Father's inabilities in this regard would pose a danger to Child. *Id.* at 30.

With respect to Mother, Ms. Smith revealed that she was diagnosed with "bipolar [disorder]" and that Mother was "inconsistent" in obtaining mental health treatment throughout Child's dependency case. *Id.* at 134. Dr. Port testified that Mother exhibited signs of delusion and paranoia, as well as anxiety, during her psychological evaluation. *Id.* at 17-18. Dr. Port opined that, similar to Father, Mother's poor mental health would negatively affect her ability to understand the needs of Child. *Id.* at 26. Specifically, Dr. Port

_____

[2] The record reveals that Child receives speech services through the county intermediate unit. *See* N.T., 6/6/24, at 129.

- 3 -

explained that Mother may "misperceive the child's needs or wants or actions which could pose a risk for the child." *Id.*

On December 19, 2023, and December 21, 2023, the Agency filed separate petitions for the involuntary termination of parental rights to Child, then eighteen months old, pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (8), and (b). On January 16, 2024, the orphans' court appointed Lara Kash, Esquire, as counsel for Child, who also served as Child's guardian *ad litem* in the juvenile court proceedings.[3] *See* 23 Pa.C.S.A. § 2313(a) (providing, in part, that the court "shall appoint counsel to represent the child in an involuntary termination proceeding when the proceeding is being contested by one or both of the parents.").

---

[3] The order of appointment on the adoption docket does not specify if Attorney Kash was assigned to represent Child's legal as well as her best interests. However, the court did not appoint any other counsel for Child. *See In re K.M.G.*, 240 A.3d 1218, 1238 (Pa. 2020) (holding appellate courts should engage in "limited *sua sponte* review" to determine (1) whether the court appointed "statutorily-mandated counsel to represent the child's legal interests," and (2) "where a GAL/Counsel was appointed to represent both the child's legal and best interests, whether the orphans' court determined that those interests did not conflict."). Because Child's legal interests were incapable of ascertainment due to her young age, the court did not err by appointing a single counsel to represent Child during the involuntary termination proceeding. *See In re T.S.*, 192 A.3d 1080, 1092-1093 (Pa. 2018) (holding, "if the preferred outcome of a child is incapable of ascertainment because the child is very young and pre-verbal, there can be no conflict between the child's legal interests and his or her best interests; as such, the mandate of Section 2313(a) of the Adoption Act" is satisfied.).

The evidentiary hearing commenced on June 6, 2024, the same month that Child turned two years old. The Agency presented the testimony of its caseworker, Ms. Smith, and Dr. Port. In addition, the Agency presented the testimony of Plymouth Township police officer Ruben Rodriguez, and the supervised visitation coaches from JusticeWorks, Adriana Sheridan and Brandon Borges. Father and Mother testified on their own behalf.

At the conclusion of that hearing, the court kept the record open and continued the hearing to June 26, 2024, for the sole purpose of providing Parents with another opportunity to introduce medical records into evidence demonstrating that they had participated in mental health treatment prior to the filing of the termination petitions. *See* N.T., 6/6/24, at 220. Counsel for the parties attended the hearing on June 26. Father's counsel introduced three medical record exhibits, and Mother's counsel introduced one exhibit. *See* N.T., 6/26/24, at 3-6; *see also* Father's Exhibits 1-3; Mother's Exhibit 1. However, the court deferred its determination on the admissibility of each of Parents' exhibits to the date of the hearing for closing arguments of all counsel, which occurred on September 24, 2024. *Id.* at 4-6.

As best we can discern, the court admitted into evidence each of Parents' medical exhibits on September 24, 2024, without objection by any of the parties' counsel. The court set forth its findings regarding Parents' medical records, as follows.

> At the hearing on June 6th, 2024, I felt Parents deserved the opportunity to present medical records even though they were not

prepared with these records at the time trial was scheduled. Sadly, the medical records presented did not assist their case.

With regard to Mother's records, there were several dates where she failed to attend. On October 18th, 2023, a note by her therapist indicated she had been off her medication for two years. The therapist also noted at that time it appeared she was living in her car.

Office notes from July 2nd, 2023, the therapist had noted there had been a three-month gap since her last session. . . .

. . .

Office note from September 19th, 2023, Mother reported that someone was being aggressive towards her and cops were called but would not elaborate on the situation, so she clearly wasn't dealing with her issues of domestic violence.

Father's medical records from Montgomery County Emergency Services for admission from 4/4/2024 to 4/12/2024, Father reported he was living in his car prior to the admission. He had a history and current of physical, emotional, and verbal abuse by his girlfriend. It appears that Father also was not consistent in his treatment from June of 2023, to December of 2023.

N.T., 9/24/24, at 26-28 (cleaned up).

Following closing arguments on September 24, 2024, the orphans' court ruled on the record and in open court that it will involuntarily terminate Father's and Mother's parental rights pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (8), and (b). *See* N.T., 9/24/24, at 21-32.

By separate decrees entered on September 24, 2024, the orphans' court involuntarily terminated the parental rights to Child. Mother timely filed a notice of appeal on October 18, 2024. Father timely filed a notice of appeal

on October 22, 2024.[4]  The orphans' court filed its opinion pursuant to Rule 1925(a) on November 18, 2024.

**ISSUES RAISED ON APPEAL**

On appeal, Father raises four issues challenging the sufficiency of the evidence with respect to 23 Pa.C.S.A. § 2511(a)(1), (2), (8), and (b).  ***See*** Father's Brief at 7-8.  Mother raises a single issue wherein she asserts that the court "erred in finding that [the Agency] had proven by clear and convincing evidence that Mother's parental rights should be terminated."[5] Mother's Brief at 2.  Overall, Parents challenge the evidentiary sufficiency of the court's findings with respect to 23 Pa.C.S.A. § 2511.

**LEGAL ANALYSIS**

Our standard of review in termination of parental rights cases

requires appellate courts to accept the findings of fact and credibility determinations of the trial court if they are supported by the record.  If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion.  A decision may be reversed for an abuse of discretion only upon demonstration of manifest

---

[4] Parents violated Pa.R.A.P. 1925(a)(2)(i) by failing to file and serve, concurrently with their notices of appeal, concise statements of errors complained of on appeal.  However, on October 28, 2024, Father filed a concise statement, and Mother filed a concise statement on October 29, 2024. Because the Agency does not assert prejudice as a result of Parents' untimely filings, and we are unaware of any, we do not dismiss the appeals.  ***See In Re K.T.E.L***, 983 A.2d 745, 747 (Pa. Super. 2009) (holding that the failure to file a concise statement of errors complained of on appeal with the notice of appeal will result in a defective notice of appeal, to be disposed of on a case-by-case basis).

[5] Child's counsel has joined in the Agency's appellee briefs in Parents' appeals.

unreasonableness, partiality, prejudice, bias, or ill-will. The trial court's decision, however, should not be reversed merely because the record would support a different result. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings.

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013) (citations and quotation marks omitted).

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis. This Court has explained:

> Subsection (a) provides eleven enumerated grounds describing particular conduct of a parent which would warrant involuntary termination. In evaluating whether the petitioner proved grounds under § 2511(a), the trial court must focus on the parent's conduct and avoid using a "balancing or best interest approach." *Interest of L.W.*, 267 A.3d 517, 524 n.6 (Pa. Super. 2021). If the trial court determines the petitioner established grounds for termination under § 2511(a) by clear and convincing evidence, the court then must assess the petition under § 2511(b), which focuses on the child's needs and welfare.

*In re M.E.*, 283 A.3d 820, 830 (Pa. Super. 2022) (some internal quotation marks and citations omitted). The moving party must establish the statutory grounds under both Section 2511(a) and (b) by clear and convincing evidence, which is evidence that is so "clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Id.* (citation omitted).

It is axiomatic that we need only agree with any one subsection of Section 2511(a), along with Section 2511(b), to affirm the termination of parental rights. *In re Adoption of K.M.G.*, 219 A.3d 662, 672 (Pa. Super. 2019) (*en banc*) (citation omitted). In this case, we conclude that competent

evidence supports the decrees terminating Father's and Mother's parental

rights pursuant to Section 2511(a)(2) and (b), which provide as follows.[6]

> **(a) General Rule**.—The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations**.—The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S.A. § 2511(a)(2), (b).

The grounds for termination parental rights under Section 2511(a)(2),

"due to parental incapacity that cannot be remedied, are not limited to

affirmative misconduct; to the contrary, those grounds may include acts of

---

[6] We make no determination with respect to whether competent evidence supports the decrees pursuant to Section 2511(a)(1) and (8).

refusal as well as incapacity to perform parental duties." *In re Adoption of M.A.B.*, 166 A.3d 434, 444 (Pa. Super. 2017) (citation omitted).

It is well-settled that Section 2511(a)(2) provides the statutory basis for "terminating involuntarily the rights of a parent with a physical or mental impairment." *In re Adoption of J.J.*, 515 A.2d 883, 893 (Pa. 1986). Our Supreme Court emphasized, "the focus in such cases is the effect which an impairment has on the person's ability to provide parental care, not the mere fact of impairment. . . ." *Id*. As such, the Court explained, "The fact that a parent suffers from a physical or mental disability is not, and never was, the only relevant factor in determining whether his or her parental rights should be terminated, or whether there should be a different legal standard applied." *Id*.

Section 2511(b) mandates that the "primary consideration" for a court in considering an involuntary termination petition be to the child's "developmental, physical and emotional needs and welfare." *In the Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023) (quotation marks omitted); *see also* 23 Pa.C.S.A. § 2511(b). The child's bond with the parent, "plus permanency, stability and all 'intangible' factors may contribute equally to the determination of a child's specific developmental, physical, and emotional needs and welfare, and thus are all of 'primary' importance in the Section 2511(b) analysis." *K.T.*, 296 A.3d at 1109. The High Court emphasized that courts

> must consider whether, in the context of all these factors, the parental bond is "necessary and beneficial" to the child. *See* [*In*

*re N.A.M.*, 33 A.3d 95, 103 (Pa. Super. 2011)] (courts "must examine the status of the bond to determine whether its termination would destroy existing, necessary and beneficial relationship") (quotation marks omitted). *See also Int. of M.E.*, 283 A.3d 820, 836–37 ([Pa. Super.] 2022) (To the extent there is a bond, the trial court must examine whether termination of parental rights will destroy a "necessary and beneficial relationship[.]")

*K.T.*, *supra*.

Furthermore, in *T.S.M.*, *supra*, the High Court stated that, "[c]ommon sense dictates that courts considering termination must also consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents." *In re T.S.M.*, 71 A.3d at 268. The Court directed that, in weighing the bond considerations pursuant to Section 2511(b), "courts must keep the ticking clock of childhood ever in mind." *Id.* at 269. The *T.S.M.* Court observed that, "[c]hildren are young for a scant number of years, and we have an obligation to see to their healthy development quickly. When courts fail . . . the result, all too often, is catastrophically maladjusted children." *Id.*

**TERMINATION PURSUANT TO 23 Pa.C.S.A. § 2511(a)(2)**

**A. Father's Appeal**

We begin with Father's argument that the evidence does not support the termination of his parental rights pursuant to Section 2511(a)(2). Specifically, he asserts that none of the Agency's witnesses testified with respect to the third element of that subsection, *i.e.*, "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by

the parent." Father's Brief at 16; ***see also*** 23 Pa.C.S.A. § 2511(a)(2). In short, Father asserts that "given more time, reunification may be possible." ***Id.*** at 19. The crux of his argument, for which he provides no legal support, is as follows:

> To just use a 'normal' timeline for reunification does not take into consideration the mental health issues that Father has. According to the witnesses, he is trying his best under the circumstances.

Father's Brief at 19 (cleaned up). We must disagree.

The orphans' court emphasized that both witnesses from JusticeWorks, the agency which provided coached and supervised visitation for Parents, "provided credible testimony that Parents often needed prompting and often did not follow through on suggestions made during the visits. . . . Most importantly, Parents never progressed to semi-unsupervised or unsupervised visits." N.T., 9/24/24, at 24.

Father, however, asserts that the court's finding is contradicted by the testimony of Mr. Borges, as follows.

> Q. Do you believe that if [Parents] had more time, they could get into semi-supervision and then eventually —
>
> A. I believe if they had had more time **and that they had been consistent with how they were during the timeframe that I observed them**, yes, I think they would have moved into semi-unsupervised.

Father's Brief at 17 (citing N.T., 6/6/24, at 101) (emphasis added). We are not persuaded by Father's argument based upon the overall testimony of Mr. Borges', discussed *infra*.

By way of background, JusticeWorks began working with Father as a "visit coach" in April of 2023, when Child was approximately ten months old. N.T., 6/6/24, at 57. Ms. Sheridan explained that she served in this capacity, which we gather was for six months, and it involved attending and observing Father's visitations with Child and providing "suggestions to" him. *Id.* at 57, 96-97. She testified that Father "would sit back and not . . . go to [Child]. He would wait until he was prompted to go play with her or he would need help positioning her how to be held." *Id.* at 62. Ms. Sheridan clarified that Father "needed to be directed on how to do everything." *Id.* at 68. Moreover, she explained that Father "would acknowledge that I was suggesting something," but he did not put her suggestions into practice at any future visits. *Id.* at 62-63, 68.

Mr. Borges, a JusticeWorks' program supervisor, directly served as Parents' "visit coach" starting on October 15, 2023, which was six months after Father started the services. *Id.* at 83, 85, 96. Mr. Borges continued as Parents' "visit coach" for eight weeks, until December 16, 2023. *Id.* He described Father's interactions with Child, as follows.

> There were times that [Father] would hold [Child] and not move around. There was one visit that I had to give him some prompting. He held her for about fifteen, twenty minutes in one place without moving around, without rocking, just standing still in the middle of the visit room.

*Id.* at 88. With respect to whether Father implemented the "suggestions" he was provided during the coached visits, Mr. Borges testified that "there was

one visit that he didn't need any prompting for, but I will say there was prompting at every other visit that I was at with him." *Id.* at 93.

At the time of the termination hearing, Parents were both participating in "supervised visits" with Child, which Mr. Borges described as visits where "we are just there to observe and make sure nothing safety-wise happens, but there is no coaching, there is no guidance." *Id.* at 84, 95.  Mr. Borges explained that, had Parents been successful with "visit coaching," they would have transitioned to "semi-unsupervised" visits, which would have still included "visit coaching . . . and then eventually we would have been just not there at all for them to be unsupervised." *Id.* At 95.

Based on the totality of Mr. Borges' testimony, we reject Father's argument that the above-referenced statement by Mr. Borges contradicts the court's finding that the conditions and causes of Father's incapacity cannot or will not be remedied pursuant to Section 2511(a)(2).  Indeed, by the end of the eight weeks that Mr. Borges served as Father's "visit coach," Father had been receiving these same services from JusticeWorks for approximately eight months.  Prior to that, he participated in "a curriculum-based parenting" book program through JusticeWorks where he received "direct one-on-one coaching from staff to do the book curriculum." *Id.* at 84.  However, to the best of his knowledge, Mr. Borges testified that Father never completed that program. *Id.*

Thus, by the time that Mr. Borges ended his direct visit coaching in the case in December of 2023, Child had been in the Agency's placement for her entire eighteen months of life and Father had not advanced to semi-unsupervised or unsupervised visitation. In addition, there is no evidence in the certified record that Father was receiving mental health treatment during this time. *See* N.T., 6/6/24, at 31 (Dr. Ports' testimony that a diagnosis of schizophrenia requires regular and continued treatment to manage it); *see id.* at 108-109 (Ms. Smith's testimony that Father has not received mental health treatment during Child's dependency). We conclude that the court did not abuse its discretion with respect to the third element of Section 2511(a)(2) based on Mr. Borges' testimony.

To the extent Father asserts that the court abused its discretion in not giving him more time to progress in his parenting skills due to his mental illness, he is mistaken under the law of this Commonwealth. *See J.J.*, 515 A.2d at 893 ("The fact that a parent suffers from a physical or mental disability is not, and never was, the only relevant factor in determining whether his or her parental rights should be terminated, **or whether there should be a different legal standard applied**.") (emphasis added). As such, we reject Father's argument on appeal with respect to Section 2511(a)(2). On this record, the evidence amply demonstrates that Father's repeated and continued incapacity caused by his mental illness has caused Child to be without essential parental care, control, or subsistence,

and the conditions and causes of his incapacity cannot or will not be remedied. *See In re T.S.M.*, 71 A.3d at 267 (reiterating that appellate courts must "accept the findings of fact and credibility determinations of the trial court if they are supported by the record.").

### B. Mother's Appeal

Mother advances a similar argument in her appeal. She contends that "the testimony also established that her incapacity could be remedied." Mother's Brief at 11. Specifically, Mother claims that the evidence showed that she "was progressing in her visits. . . ." *Id.* at 6. In contradictory fashion, however, Mother contends that the evidence also failed to demonstrate that she "could not capably parent her child," namely, that Dr. Port's evaluation occurred eleven months before the termination hearing. *Id.* at 6-7. Mother's claims are without merit.

Ms. Sheridan began providing coached visiting services to Mother in September of 2022, when Child was three months old, and she continued in this capacity until October of 2023. *See* N.T., 6/6/24, at 57. She described Mother as being "very positive towards" Child during visits. *Id.* at 59. However, Ms. Sheridan testified with respect to Mother's parental skills, as follows.

> A.    If I gave a suggestion during the visit, [Mother] would do the task that I asked her, but as the visit would go on, she would either forget or stop doing that, and then at the next visit, she wouldn't continue to work on that.
>
> **Q. Did that ever change?**

**A. No.**

Q. As [Child]'s needs changed as she got older, did Mother still require prompting from you to interact with her?

A. Yes.

Q. Can you give us some examples?

A. Age-appropriate activities was a big one.  She would expect [Child] to do some activities that she just wasn't old enough for yet. . . .

Q. So would you say her expectations of her daughter's developmental needs were inaccurate?

A. Yes.

*Id.* at 60 (emphasis added).  On cross examination by Child's counsel, Ms.

Sheridan further testified, as follows.

A.    If Mother would look at me during the visit because she didn't maybe understand how [Child] was reacting, I would explain to her some things she could do, and at times, she would ask me questions also, and I would prompt her on an alternative action she could do with [Child].

Q. Were there ever any times where you had to become involved immediately because you were concerned with [Child]'s safety?

A. Yes.  . . .  One time specifically we were sitting [on] the park bench, and [Mother] and [Child] . . . were sharing a snack, and [Child] was not able to completely sit on her own and was kind of swaying and fell backwards, and she cut her lip and was bleeding. And Mother was a bit frantic, so I stepped in to try to clean [Child] up, and explained to [Mother] that she should support [Child] in the back[,] and have a hand on [Child,] or have [Child] on her lap during times like that.

. . .

Q. And would you also offer suggestions at the end of visits during what you described as a debriefing afterwards?

A. Yes.

Q. And was mom responsive to that?

A. She would thank me for my suggestion, but it didn't follow into the next visit.

Q. So she seemed willing and cooperative to you?

A. Yes.

Q. But she struggled with the implementation of your suggestions?

A. Yes.

. . .

Q. **Was she able to use your suggestions at all in the future, or was it starting over at every visit?**

A. **It was starting over at every single visit.**

*Id.* at 66-68 (emphasis added).

Mr. Borges testified that when he took over the coached visiting in October of 2023, Mother was not receptive to his parenting "suggestions" until Mother and he had "developed a rapport," which took approximately four weeks. *Id.* at 88, 93. Mr. Borges did not have any complaints about Mother's ability to interact with Child during the remaining four weeks that he coached her visits. *See id.* at 97-98. However, the Agency caseworker, Ms. Smith, testified that Mother never fully achieved an ability to understand Child's "age-appropriate behavior." *Id.* at 137. Ms. Smith did testify that a bond has been "growing during each visit" between Mother and Child. *Id.* at 154.

Nevertheless, Mother's visits never progressed beyond supervised for the following reasons.

According to Ms. Smith, Mother did not consistently acknowledge her mental health condition, *i.e.*, bipolar disorder, and she did not regularly receive medication management or mental health therapy during the case. *Id.* at 134-135. Ms. Smith testified that Mother's last mental health therapy appointment was on November 16, 2023, and she had none scheduled at the time of the termination hearing. *Id.* at 160-161.

In addition, Ms. Smith testified that Mother's visitation never moved beyond supervised because Parents had a history of domestic violence with each other, which continued throughout Child's dependency. *Id.* at 125. She described Parents' relationship as "volatile." *Id.* at 140. For example, Police Officer Rodriguez testified during the termination hearing that, in January of 2024, Parents were involved in a domestic assault that occurred in a Wawa parking lot. *Id.* at 46. When he arrived on the scene, Officer Rodriguez observed Parents "in the parking lot of the Wawa screaming at each other." *Id.* He testified that Father "had multiple lacerations to his neck and face[, which] . . . [Father] said occurred during his physical altercation" with Mother. *Id.* at 47. Parents both told Officer Rodriguez that they were together in the car when Mother "became irritated about [Father] hitting the emergency brake and how he could possibly damage the vehicle, until they got to the Wawa parking lot and the[ir] whole argument became physical." *Id.* at 47-48.

Mother told Officer Rodriguez that Father was "pulling and choking her," but the officer did not observe any injuries on Mother. *Id.* at 48. Officer Rodriguez testified that, following the incident, Mother was taken into police custody and charged with crimes, but Father waived the charges during the preliminary hearing, and the criminal case against Mother was dismissed. *Id.* at 48, 54.

In addition, Ms. Smith testified that Father has a pending criminal charge for strangulation of Mother, but she did not clarify whether the charge stemmed from the same incident. *Id.* at 116. What is important with respect to Mother, however, is that Ms. Smith offered Mother resources for domestic violence services "a few times" throughout the case, including after her alleged strangulation, but Mother "declined" them. *Id.* at 116-117. Thus, Mother has never addressed the domestic violence goal included in the family service plan. *Id.* at 126.

Finally, Ms. Smith testified that Mother never had appropriate housing during Child's dependency case. *Id.* at 111-112. At the time of the termination hearing, she did not know where Mother lived. *Id.* at 113.

Based on the foregoing, we conclude that the court did not abuse its discretion in terminating Mother's parental rights pursuant to Section 2511(a)(2) despite her positive interaction and growing bond with Child during supervised visits. The record amply demonstrates that Mother's repeated and continued incapacity related to her mental illness and her refusal to consistently participate in mental health treatment, or obtain any domestic

violence services and suitable housing, has caused Child to be without essential parental care, control, and subsistence, and the causes and conditions of Mother's incapacity and refusal cannot or will not be remedied. **See In re T.S.M.**, 71 A.3d at 267.

**TERMINATION PURSUANT TO 23 Pa.C.S.A. § 2511(b)**

**A. Father's appeal**

Father's argument with respect to Section 2511(b) is similar to that he made under Section 2511(a)(2). Specifically, he asserts that would be in Child's best interests to allow him to continue reunification efforts because

> Not everyone is able to reunify on the same timeline, especially those parents with special needs. If [Father] with special needs is not able to seek the assistance of [the Agency] and must adhere to a speculative timeframe for reunification efforts, then [the Agency] is allowed the opportunity to thwart the trust necessary for the advancement of any relationship between a parent and any child.

Father's Brief at 21. We disagree.

Father's argument is primarily flawed because it is focused on his efforts to achieve reunification rather than on Child's developmental, physical, and emotional needs and welfare. **See In the Interest of K.T.**, 296 A.3d at 1105. Although Father asserts that it would be in "Child's best interests" for his reunification efforts to continue, he presents no evidence to support his position. In addition, Father fails to present any case authority in support of his claim that, because of his own special needs, he is entitled to more time

and services under Section 2511(b) to reunify with Child. We are unaware of any such authority.

The orphans' court found pursuant to Section 2511(b) that Parents are unable "to meet Child's needs [for] consistent, reliable love, affection, and responsibility." N.T., 9/24/24, at 32. The court found that Child's needs and welfare

> can best be met by termination of parental rights of both birth parents, and that [Child] will not suffer a detriment as a result of the termination of parental rights. By contrast, I find that a bond has developed between the foster parents and Child that has been described as loving and nurturing.

*Id.* The record supports the court's findings.

Ms. Smith described Child as being "hesitant" at the beginning of each supervised visit, "but then she does warm up to" Parents. N.T., 6/6/24, at 144. Ms. Smith testified that Father is "very loving with" Child. *Id.* However, Ms. Smith provided no evidence that a parent-child bond exists between Child and either Father or Mother. Ms. Smith testified:

Q. In observing foster mother, [M]other, and [F]ather, who does [Child] go to and rely on to have her needs met?

A. The foster parents.

Q. Have you observed [Child] in the foster home?

A. Yes.

Q. Can you describe the relationship between the foster parents and [Child]?

A. They're very loving. They meet . . . her needs. . . . [Child] just seems to be doing well.

*Id.* She further testified that the foster parents or pre-adoptive resource for Child. *Id.* at 130.

In addition, neither Ms. Sheridan nor Mr. Borges testified that a parent-child relationship exists between Child and Father. Mr. Borges testified as follows regarding his observations during coached visitation for approximately the last eight weeks of 2023.

> Q. What did you observe about [Child]'s reaction to leaving foster mom at the beginning of the visits?
>
> A. Leaving foster mom was rough at first. [Child] would cry. She would be a little bit upset. Depending on what parent greeted [Child] at the time, she would calm down sooner than later.
>
> Q. For which parent?
>
> A. Meeting [Mother] she would calm down a little bit quicker. Leaving, she would run right to [the foster mother]. [Child] would be ready to go, always happy to see her.
>
> Q. Did [Child] ever appear sad to leave Mother or Father?
>
> A. No.

*Id.* at 90-91.

Based on the foregoing testimony, we discern no abuse of discretion by the court in determining that Child's developmental, physical, and emotional needs and welfare will be served by the termination of Father's parental rights. *See K.T.*, 296 A.3d at 1109; *In re T.S.M.*, 71 A.3d at 268.

### B. Mother's Appeal

Mother contends with respect to Section 2511(b) that she

was progressing in her visits and interactions with [C]hild, loved and cared for the child and had established a parental bond with [C]hild. The evidence never established that severing the parent[-]child bond would not be detrimental to [C]hild's best interests.

Mother's Brief at 6. However, Mother fails to provide any meaningful discussion under Section 2511(b) and fails to cite to any applicable legal authority. Therefore, we conclude that Mother has waived her claim under Section 2511(b). **See In re M.Z.T.M.W.**, 163 A.3d 462, 465-466 (Pa. Super. 2017) (citation omitted) (reiterating that a claim is waived where an appellate brief fails to provide any discussion of the claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review).

Even if Mother did not waive her claim, we would conclude that the orphans' court did not abuse its discretion in terminating her parental rights pursuant to Section 2511(b). Assuming *arguendo* that a bond existed to some extent between Mother and Child, there is no evidence on this record that it was "necessary and beneficial" to Child. **See K.T.**, 296 A.3d at 1109. Further, the record amply supports the court's determination that Child's needs for permanency and stability required the termination of Mother's parental rights pursuant to Section 2511(b). **See id.** Accordingly, we affirm the decrees involuntarily terminating Father's and Mother's parental rights.

Decrees affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/23/2025